TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-08-00608-CR






Carlos Molina, Appellant


v.


The State of Texas, Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT

NO. D-1-DC-07-204572, HONORABLE FRED A. MOORE, JUDGE PRESIDING




M E M O R A N D U M O P I N I O N


 Appellant Carlos Molina was convicted by a jury of murder. See Tex. Penal Code
Ann. § 19.02 (West 2003). The jury assessed punishment at twenty-seven years' confinement in the
institutional division of the Texas Department of Criminal Justice. In a single point of error,
appellant complains that the trial court abused its discretion by denying appellant's request to reopen
the evidence. We will affirm the judgment of conviction.


BACKGROUND

 The jury heard evidence that on August 4, 2007, appellant stabbed his neighbor
Daniel Delira to death. It was undisputed that appellant killed Delira. Appellant focused his strategy
on defense-of-self and defense-of-third-person theories.

 Efrain Jasso, a friend of Delira's, testified that he was fixing one of Delira's cars in
his apartment complex on the day of the murder. Jasso stated that he saw Delira and appellant
talking and then fighting. The two fought for approximately five to eight minutes. Jasso testified
that he intervened and broke up the fight. Jasso helped Delira to his feet, and appellant left. Jasso
testified that he and Delira were walking toward where Jasso was fixing the car when they heard a
yell from up above. He stated that he saw appellant coming back with a kitchen knife. Appellant
pursued Delira as he ran into a nearby apartment. (1) Jasso stated that Delira attempted to close the
apartment's door so appellant "would not hit him with the knife." Delira ultimately let the door go
or was unable to hold it, and both he and appellant ended up inside the apartment. Jasso testified that
Delira tried to get ahold of the knife. Appellant then stabbed Delira. Jasso tried to put a blanket in
between them so that appellant would stop stabbing Delira. Jasso helped Delira up and they walked
out of the apartment. Jasso helped Delira try to get to his apartment. Delira stopped in the
breezeway of the apartment complex. Jasso stated that he tried to signal a police helicopter that was
overhead and tried to call 911. Jasso further testified that he was with Delira when he died.

 Antonio Chapparo-Carreno testified next for the State. Chapparo lived in apartment
141 with his brother, his mother, and three friends. He testified that he was sitting on his bed
watching television when he heard yelling, and then Delira rushed into his apartment. When asked
what Delira was doing when he entered his apartment, Chapparo responded, "I imagine he was trying
to protect himself. He was trying to close the door." Chapparo testified that appellant was trying
to push his way in. When he saw appellant trying to stab Delira, Chapparo fled the apartment.

 Elifas Cruz-Massariegos testified that he had lived in appellant's apartment for two
days before the murder. Cruz testified that he arrived at the apartment complex that day about four
o'clock. He noticed that appellant was drunk. Cruz drank two beers that appellant offered him and
then went to take a nap because it was a very hot day. Cruz got up around five o'clock and started
fixing himself something to eat. He testified that appellant went outside the apartment and that
shortly thereafter he noticed a lot of talking coming from outside. Cruz stated that he opened the
door and saw appellant and Delira fighting. Cruz testified that they were both hitting each other. 
According to Cruz, appellant eventually came back into his apartment and closed the door. 
Appellant then picked up a knife from the kitchen and ran back outside. Cruz testified that
appellant's wife attempted to stop him. She attempted to take the knife away from him, but was
overpowered by appellant. Cruz did not see Delira using a weapon.

 Officer Ryan Miller, a tactical flight officer with the Austin Police Department,
described the crime scene. He responded to the scene less than a minute after being dispatched. 
Miller also identified an aerial video of the crime scene. 

 Sergeant James Watzke with the Austin Police Department responded to the scene
as well. He met with the first unit at the scene, Lieutenant Ockletree. Watzke saw EMS personnel
attending to a man lying on the ground. Ockletree informed Watzke that other residents of the
complex said the person who had stabbed Delira was in apartment 144. After some time, appellant
was apprehended and placed in custody. According to Watzke, when the crowd of people that had
gathered saw appellant, they shouted, "That's him, that's him."

 Dr. David Dolinak, the Travis County Chief Medical Examiner who performed the
autopsy on Delira, testified that Delira suffered multiple wounds on his body. A stab wound in
Delira's right shoulder penetrated the muscle in the side of his neck and went through a vein in the
side of his neck. According to Dolinak, this wound would not necessarily have been fatal. The
mortal stab wound went through Delira's ribs on the right side. It was six inches deep and made a
one-inch cut to the back side of Delira's heart. The cut caused bleeding which filled the pericardial
sac around the heart. Dolinak testified that bleeding into the pericardial sac causes pressure around
the heart "until it gets so compressed by the blood around it that it can't function and pump blood
anymore." In this way, the bleeding into the pericardial sac eventually caused Delira's heart to stop. 
Dolinak also testified that Delira suffered defensive wounds to his left hand and left arm during the
attack. On cross-examination Dolinak acknowledged that all of the wounds could have been caused
by Delira lunging at appellant. Dolinak also noted that Delira had an ethanol level of .17, a vitreous
alcohol level of .21, and a small amount of cocaine in his system.

 Appellant called Angel Mireles, a neighbor who lived directly above appellant's
apartment. He observed appellant and Delira fighting, and he saw Delira push appellant's wife
against a wall. Mireles testified that he heard Delira threaten to kill appellant. According to Mireles,
Delira had been "threatening a lot of people with a gun that he had." Mireles testified that he did not
see the stabbing.

 Appellant also testified. He stated that he and Delira had a previous encounter three
weeks to a month earlier. Appellant testified that Delira was angry with him because he had called
the police on him. Appellant called the police because he thought Delira had broken his window. 
Appellant stated that Delira had told him he was going to kill him. He stated that Delira was "crazy"
and "was always drugged out and he was always drunk and he wanted to kill me with a shotgun."
Appellant further testified that on the day of the murder, he had been threatened by Delira. He stated
that when he left his apartment to go to his car, Delira came at him and started hitting him. 
Appellant testified that when his wife came to help him, Delira punched her. According to appellant, 
while his wife was defending him, he went inside the apartment and Delira followed. Appellant
stated that he was scared, so he grabbed a knife. Appellant testified that Delira was going to kill him,
and that he was afraid Delira would hurt his wife and child, so he stabbed Delira. His wife then
pushed appellant and Delira out the door. Appellant testified, "I was trying to defend myself, so I
was going towards the apartment. I was getting closer to the other apartment." He further stated,
"when I stabbed him, he was trying to take the knife from me."

 The record indicates that appellant gave two statements to law enforcement officers
on the day of the killing. The first statement, which was not offered until appellant's motion to
reopen the evidence, was taken at the hospital following appellant's arrest. The second statement,
which the State used to impeach appellant, was taken in an Austin Police Department
interview room.

 The second statement concerned whether or not appellant was drunk the night of the
killing. Appellant stated that he had drunk at least ten beers, but was not drunk because he had eaten
before drinking. (2) Appellant testified, "I wasn't drunk. I do say that I was a little drunk, but I wasn't
drunk." The State continued to impeach appellant with his statements to police officers, specifically,
"So she [appellant's wife] said to me, she said, 'You know what, leave him alone.' But when
someone is drunk, it's like you are a kid and don't obey," and "Because I was so hotheaded, that's
when I hit him."

 On redirect, appellant testified that he did not intend to stab Delira in the heart. 
Appellant testified that he stabbed Delira "[o]nly to defend myself out of fright, that's all." The State called Tomas Leon, who translated from Spanish to English the second
statement appellant gave to Detectives Rodriguez and Guajardo. The State introduced the translated
transcription of the interview into evidence, and the defense offered the original video of
the interview. 

 The State next called Austin Police Department Detective Richard Guajardo. He
questioned appellant in Spanish following the arrest both at the hospital and in an interrogation
room. Guajardo testified concerning the second statement. According to Guajardo, appellant never
indicated during the interview that anyone assaulted his wife. He further testified that he visited with
appellant's wife on the day of the killing and observed no injuries. Guajardo stated that appellant
used the excuse that he was drunk on many occasions during the interview. Both parties closed after
Guajardo's testimony.

 In the first statement, which was taken at the hospital, appellant talked to Guajardo
about the killing. Appellant mentioned that Delira had made a death threat against him in the past. 
He noted that he had called the police on Delira before because he suspected him of breaking his
window. He also made the statements that Delira had "pushed my wife," and that "he [Delira] is
bothering my family." He did not make any comments that established that Delira pushed his wife
inside the apartment, or that he initially stabbed Delira inside the apartment. Appellant made several
comments throughout the interview to the effect that he did not really know what happened.

 The objection giving rise to this appeal occurred during the State's closing argument. 
The attorney for the State told the jury, 

 

 An angry drunk lost the fight and he killed somebody. . . . There is nothing--he gave
that statement right after this occurred. . . . But there is nothing about the victim
going into the defendant's home. No mention of that whatsoever. And that's a
statement that he gave right after it happened. There was nothing at all in that
statement about Daniel Delira--there is nothing about Daniel Delira going into the
home or Daniel Delira assaulting the defendant's wife. There is nothing about that
in that statement.



 Appellant's counsel asked to approach the bench, where the following exchange occurred:

 

 DEFENSE COUNSEL: Your Honor, I believe that the prosecutor is giving an
improper impression on the jury and I am going to ask the Court to open the evidence
again and allow us to get into my client's statement, the first statement, in which it
does say that his wife was pushed.


 PROSECUTOR: Your honor, there's nothing--


 COURT: It's overruled. We will not open the evidence again. 

The State then continued by arguing, 

 There is nothing in that statement that he said--let's look at this. If that really
happened and you are really defending your family, the first thing you are going to
say is Officer, Officer Guajardo. You have got to understand. I did that but you have
got to understand, he broke into my house and my wife was in danger and my kid
was in danger so I had to stab him. Wouldn't that be the first thing that you would
say? Instead what he says is I was drunk, the guy beat me up. Do you understand? 
I was hotheaded. I was mad. . . . I am going to ask you do not--and I really don't
believe any of you believe his statement. And if there is any question, just look at his
original statement which is self-serving but completely inconsistent.



Again, appellant's counsel objected:

 

DEFENSE COUNSEL: The statement in evidence is not the original statement. I am
asking the Court to open the evidence to get the original statement in under
Rule--Article 3602 of the Code of Criminal Procedure, your Honor.


 THE COURT: You offered it, sir. Y'all said it was the interview with the police.


 DEFENSE COUNSEL: It was the second interview, your Honor. I am asking if the
Court would open the evidence to get the first interview in. The prosecutor is leaving
a wrong impression on this jury.


 THE COURT: No, sir. Whatever it is, the evidence will not be reopened in this case. 
Please continue, sir.



 Appellant perfected a bill of exception following argument and offered the transcript
of the statement. The judge accepted the transcript for the purposes of the bill of exception, but it
did not go to the jury.


STANDARD OF REVIEW


 A trial court shall allow testimony to be introduced at any time before the argument
of a cause is concluded, "if it appears that it is necessary to a due administration of justice." 
Tex. Code Crim. Proc. Ann. art. 36.02 (West 2007). "Due administration of justice" means a judge
should reopen the case if the evidence would materially change the case in the proponent's favor. 
Peek v. State, 106 S.W.3d 72, 79 (Tex. Crim. App. 2003). Under this interpretation, litigants are
encouraged to introduce their evidence during the course of the trial rather than waiting until closing
arguments. Id.; Allman v. State, 164 S.W.3d 717, 719 (Tex. App.--Austin 2005, no pet.). This
Court in Allman noted that the standard thereby prevents either party from seeking out additional
evidence in order to counter the other party's argument. 164 S.W.3d at 719. The court in its sound
discretion can admit evidence at any time before argument closes and such discretion will be
reversed only when abused. Perry v. State, 464 S.W.2d 660, 662 (Tex. Crim. App.1971) (finding
no abuse of discretion where trial court allowed State to reopen evidence after both parties
had rested). 


DISCUSSION


 Appellant points to two specific points he made in the first statement that he claims
would have materially changed the case in his favor. The first was his statement that the decedent
"pushed my wife." Later in the interview, appellant stated that "he [the decedent] is bothering my
family." Appellant claims that his theories of self-defense and defense of a third person were
undermined by the State's argument that during police interrogation (the second statement) he said
nothing of an attack on his wife. Under the standard set forth in Peek, in order to show that the trial
court abused its discretion, appellant must show that the evidence he sought to introduce would have
materially changed the case in his favor. 106 S.W.3d at 79. Although we do not condone the trial
court's statement that he would not reopen the evidence, "[w]hatever it is," we hold that the trial
court could have reasonably concluded that the first statement would not have materially changed
the case in appellant's favor had it been introduced.

 Appellant gave the first statement to Detective Guajardo, the same detective who took
the statement that was admitted at trial. From the context of the first statement, it appears that the
interrogation was conducted at the hospital. First, we examine appellant's statement to police
officers that Delira had "pushed my wife." It is not clear from the context of the statement when
appellant was claiming that Delira pushed his wife. In fact, in the same sentence, appellant makes
reference to another time when Delira allegedly broke appellant's window. Nowhere else in the
statement does appellant state that Delira had pushed his wife.

 Second, we examine appellant's statement, "he [Delira] is bothering my family." The
statement lacks specificity as to what Delira did to bother appellant's family or when it happened. 
After reading the statement in its entirety, it appears that there was bad blood between appellant and
Delira. Appellant testified that he had called the police on Delira in the past because he thought that
Delira had broken his window, which resulted in his son being cut by broken glass. No charges were
brought against Delira, due to lack of evidence.

 The first interview also yielded other statements that might or might not have been
helpful to appellant. These statements included, "He hit me there and I reacted badly like an animal
and I hit him . . . I don't know what happened," "I [inaudible] reacting . . . I don't know what
happened . . . I lost my mind . . . I [inaudible] my mind and I don't know what I did to him," "I don't
remember if I hit him [inaudible] I remember that I let it get to me [inaudible]," and "I don't
remember I [inaudible] the blood to the head [inaudible] I lost my head and well I started to hit him." 

 Appellant also conceded in the first statement that his fight with Delira did not take
place inside his own apartment. The following exchange was recorded in the transcript of
appellant's first statement: 


GUAJARDO: Ok, and where did all this happened [sic], when you got really angry
with him?


APPELLANT: Because he hit me . . .


GUAJARDO: Ok, but, where did it happened [sic]?


APPELLANT: In my apartment.


GUAJARDO: In front of it?


APPELLANT: Yes.



 We conclude that appellant's theories of self-defense and defense of others would
likely not have been helped by the introduction of the first statement. The stated purpose of the
standard set forth in Peek is to encourage litigants to introduce their evidence during the course of
the trial rather than waiting until closing arguments. 106 S.W.3d at 79. Appellant testified in his
own defense in this case. Officer Guajardo testified about the second statement. Appellant's counsel
did not seek to introduce the first statement at any point in the trial other than when the State made
its closing argument. While the first statement contains some information different from the second,
it does not rise to the level of materially changing the case in appellant's favor. All witnesses except
appellant testified that appellant pursued Delira into another apartment. Even under appellant's
version of the events, the fatal stabbing did not take place in appellant's apartment. This greatly
diminishes the impact of the first statement on appellant's defense-of-third-person theory. We
cannot say that the trial judge abused his discretion by refusing to reopen the evidence. 

 We overrule appellant's point of error.


CONCLUSION


 Having overruled appellant's sole point of error, we affirm the judgment
of conviction.


 

 J. Woodfin Jones, Chief Justice


Before Chief Justice Jones, Justices Puryear and Henson


Affirmed


Filed: May 21, 2009


Do Not Publish
1. Delira ran into apartment 141. Appellant lived in apartment 144. The two apartments were
adjacent to one another.
2. Appellant also testified that he was drinking Bud Light, which in his estimation is not a
strong beer.